# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **JAMES GARRETT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | No.: 3:17-cv-00497 |
| ) | **Chief Judge Crenshaw** |
| **CSX TRANSPORTATION, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

James Garrett is a CSX Transportation, Inc. ("CSXT") locomotive engineer who, after being placed out of service with no pay for a year, filed suit in this Court under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); and the Tennessee Disability Act, T.C.A. § 8-50-103 ("TDA"). CSXT has filed a Motion for Summary Judgment (Doc. No. 27) on all claims, which has been fully briefed by the parties (Doc. Nos. 28, 30 & 36). For the reasons that follow, the Motion will be denied.

## I. Background

Collectively, the parties have filed 166 numerical paragraphs of supposedly undisputed facts, the majority of which need not be recounted because one, over-arching, and controlling fact is disputed -- whether Garrett was able to continue performing his duties as an engineer when he was placed off work. The following summary provides the necessary context:

Garrett was hired by CSXT as a conductor in 2006, and promoted to engineer in 2010. As an engineer, his primary responsibility is to ensure that the freight train he operates gets from one location to another safely. He is required to keep an eye out for obstructions on the track, and control the speed and direction of the train. On all trips, he is paired with a conductor who also has

physical access to the train controls, and Garrett spends most of his time in the engine room listening to directions and instructions from the conductor. Additionally, the train is equipped with a safety device called an "alerter" that sounds every twenty seconds when a train is in motion. If the train operator fails to respond to the alert, the train is remotely brought to a stop.

CSXT engineers do not undergo annual physical or medical evaluations, and it is unusual for engineers to be sent for physical exams. Nor are they required to undergo cardiac stress tests. Instead, engineers are only subjected to random drug tests, and must undergo hearing and vision screenings every three years in accordance with federal regulations and the collective bargaining agreement between CSXT and the Brotherhood of Locomotive Engineers and Trainmen union. Engineers are required to report significant medical issues to CSXT, however.

On April 9, 2014, Garrett submitted CSXT's "Medical Screening Report Form," which contained sections relating to his vision and hearing. He checked the box marked "NO" to the question, "During the last three (3) years, or since you have last worked for CSXT (whichever is longer), have you been treated by a physician for any conditions(s) which could affect your ability to safely perform the essential functions of your job?"

Four times between 2013 and 2016, Garrett requested FMLA leave that CSXT did not question and approved. On March 1, 2016, another request for intermittent leave was submitted, with the Certification of Health Care Provider Form filled out by Dr. Shaun Gill, Garrett's treating physician. After checking the box for intermittent leave, and estimating the "frequency and duration of episodic flare-ups," Dr. Gill did not check the following box for part-time or reduced work schedule. Nevertheless, he mistakenly wrote "6" in the place provided for the number of hours to be worked each day. The form thus reads:

```
[ ] Part-time or Reduced work schedule, NOT including absence
    for episodic flare-ups, treatment, and or appointments.

6 hours each day; ____ days each week from_____ to _____
```
(Doc. No. 32-6 at 12).

CSXT read the form as restricting Garrett from working more than six hours per day. This was something CSXT could not accommodate because train crews work 12 hour shifts, and a train cannot be stopped to replace a crew member. By letter dated March 8, 2016, signed by Dr. Craig Heligman, CSXT's Chief Medical Officer, Garrett was informed that he was "medically unqualified for all service," effectively immediately. Garrett then contacted Dr. Gill who removed the 6 hour notation the next day.

After removing Garrett from service, CSXT requested and reviewed additional medical records, ostensibly to substantiate the 6 hour per day restriction. This included treatment notes from Garrett's cardiologist, Dr. Don Chomsky.

CSXT's review of Garrett's medical records led to the discovery that he had an Implantable Cardioverter Defibrillator ("ICD") inserted on October 2, 2014.[1] This prompted Dr. Heligman to send an email on March 17, 2016 to Fred Crane, CSXT's Vocational Rehabilitation Counselor, in which Dr. Heligman stated that, before returning to work, Garrett would have to provide an updated echocardiogram, along with documentation showing that the ICD had not discharged at any point in the year prior to Garrett's return to service. The next day, Crane sent a letter to Garrett that

---

[1] Dr. Chomsky diagnosed Garrett with congestive heart failure, not coronary heart disease, which "is typically the thing that causes most people to have heart attacks." (Doc. No. 32-5, Chomsky Depo. at 27). Congestive heart failure "really refers more to a pumping dysfunction of the heart rather than to blockages and heart attack specifically." (Id.). The condition can lead to shortness of breath and fatigue. An ICD is sometimes implanted in patients with congestive heart failure in order to monitor heart rhythm and correct any abnormalities that are detected. (Id. 11, 27-28). When asked whether an engineer is required to self-report the diagnosis of congestive heart failure or the implantation of an ICD as a "significant medical issue," Dr. Heligman conceded, "[n]ot specifically, no." (Doc. No. 32-1, Heligman Depo. at 37).

3

referenced the treatment notes from Dr. Chomsky and stated:

> Based on this information we are unable to medically qualifying (sic) you to return to work at this time. Before you can be considered for return to work as a locomotive engineer, you will need to provide us with an Exercise Stress Test with Imaging, indicating a peak MET level of 8 to 8.5 and showing LVEF greater than 40%. Your cardiologist will need to indicate that you have a NYHA class I and document that you haven't had a discharge of the ICD for the year prior to returning to work.[2]

(Doc. No. 29-6, Crane Depo. Exh. 20).

At CSXT's request, Dr. Chomsky completed an "Attending Physician's Return to Work Report" on March 13, 2016 that noted Garrett's occupation as an engineer for CSX, listed his condition as "stable," and indicated that he could return to work with no restrictions "ASAP." (Doc. No. 29-2 at 1, 2). In a follow-up June 13, 2016 "To Whom It May Concern" letter, Dr. Chomsky wrote that, since first being seen in 2014, Garrett had (1) "improved markedly"; (2) "no significant physical limitations," and (3) spent most of the time "fully employed with a railroad company with no difficulties on the job." (Doc. No. 29-4 at 52). Dr. Chomsky also observed that "[b]ased upon my most recent evaluation, which includes an exercise test on June 7, 2016, as well as an echocardiogram on April 6, 2016, it is my impression that [Garrett] is fully capable of returning back to his previous work duties with no physical restrictions." (Doc. No. 29-4 at 52).

Garrett underwent Cardiopulmonary Exercise Stress Tests on April 6, 2016 and June 7, 2016. He also underwent a Treadmill Stress Test on April 27, 2017. According to CSXT, none of those tests qualified Garrett to return to work. After a July 3, 2017 Treadmill Stress Test, however, Garret was approved to return to work and he resumed his duties as a CSXT engineer on September 5,

---

[2] MET stands for "metabolic equivalent" and measures the amount of oxygen consumed by a person at rest (Dr. Heligman Depo. Doc. No. 32-1 at 41, 70). NYHA is shorthand for New York Heart Association, an organization that has created a classification system for patients with heart conditions (Id. at 44). LVEF is an acronym for "left ventricular ejection fractions," and is a measurement of heart pumping function, with normal considered to be in the range of 55 to 70. (Doc. No. 32-5, Chomsky Depo. at 13).

2017.

The medical and cardiac requirements for Garrett's return to work as set forth in Crane's letter are not mandated by the Federal Railway Act, a written CSXT policy, or the collective bargaining agreement. Nor are there any Federal Regulations setting medical standards for train engineers with congestive heart failure or ICD implants.

Instead, Dr. Heligman claims to have adopted the standards after serving on a Federal Railroad Administration Medical Standards Committee in 2012 that considered instituting medical standards for railroad employees. The Committee reviewed medical literature, the Department of Transportation/Federal Motor Carrier Safety Administration ("DOT/FMSCA") regulations that prohibits over-the-road truckers from having ICDs, and Canadian railway standards that mandates a three-year wait between implant of an ICD and resumption of work. The Committee made certain recommendations, but no rules or regulations were adopted. (Heligman Depo. at pp. 78-79).[3]

## II. Legal Discussion

To succeed on a motion for summary judgment, the moving party must establish "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), when the evidence, and the reasonable inferences to be drawn

---

[3] Garrett has filed a Motion in Limine (Doc. No. 33) seeking to exclude CSXT's reliance on Dr. Heligman's testimony because (1) he is neither a cardiologist or railway safety expert and, (2) no expert has been designated by CSXT as required by Fed. R. Civ. P. 26(a)(2). This Motion will be denied.

In considering the Motion for Summary Judgment, the Court does not rely on any supposed expertise by Dr. Heligman. As the decisionmaker in relation to Garrett removal from work, he is the quintessential fact witness. He can also express lay opinion testimony under Rule 701 of the Federal Rules of Evidence "derived from [his] personal knowledge gained through participation" in CSXT's "day to day affairs." United States v. Kerley, 784 F.3d 327, 337 (6th Cir. 2015); see also Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 846 (6th Cir. 2015) (noting that "the modern trend among courts favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination"). As Chief Medical Officer, Dr. Heligman enforced the fitness for duty standard at issue in this case, and he can testify as to its origin and supposed adoption by CSXT without venturing into the realm of prohibited expert testimony.

5

therefrom, are construed in favor of the non-movant, EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 571 (6th Cir. 2018); Moody v. Michigan Gaming Control Bd., 871 F.3d 420, 425 (6th Cir. 2017). CSXT's motion fails with respect to all three of Garrett's claims because there is a genuine dispute of material fact as to whether he was physically qualified to be an engineer, notwithstanding the ICD implant.

A. **FMLA Claims**

Under the FMLA, "qualifying employees" are entitled "to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)).[4] The Sixth Circuit "recognizes two distinct theories of wrongdoing under the FMLA," Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir.2007), both of which are alleged here.

"The 'entitlement' or 'interference' theory" makes "it unlawful for employers to interfere with or deny an employee's exercise of her FMLA rights," id., and "[b]ecause an employer interferes with an employee's exercise of FMLA rights whenever the employee does not receive the rights that are due to her under the statute, the intent of the employer is irrelevant[,]" Wallner v. Hilliard, 590 F. App'x 546, 550 (6th Cir. 2014). "The 'retaliation' or 'discrimination' theory, on the other hand . . . prohibits an employer from discharging or discriminating against an employee for 'opposing any practice made unlawful by' the Act," Bryson, 498 F.3d 570, and an employer's "motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights," Edgar v. JAC Prod., Inc., 443 F.3d 501, 508

---

[4] "An employee is not limited to "block leave" and can take leave intermittently. Greer v. Cleveland Clinic Health Sys.-E. Region, 503 F. App'x 422, 426 (6th Cir. 2012) (citing 29 U.S.C.A. § 2612(b)(1)).

(6th Cir. 2006).

Regardless of theory, CSXT argues "[t]he same undisputed facts defeat [Garrett's] FMLA interference and retaliation claims: [Garrett] was not physically qualified to be a railroad engineer when he requested intermittent FMLA leave or when he was unable to 'pass' the stress test." (Doc. No. 28 at 11). In support, CSXT relies on Hatchett v. Philander Smith Coll., 251 F.3d 670, 677 (8th Cir. 2001) wherein the Eighth Circuit, in a case of first impression, held that "an employee must be able to perform the essential functions of the job to take intermittent or reduced schedule leave[.]" CSXT also relies on Kleinser v. Bay Park Cmty. Hosp., 793 F. Supp. 2d 1039, 1044 (N.D. Ohio 2011), which cited Hatchett to support the hypothetical that if an employee who manages a chemical plant's control panel is advised by his doctor that the employee's chronic susceptibility to epileptic seizures leaves him unable to safely perform his duties," that employee is not entitled to intermittent leave.

Here, neither Dr. Gill, the treating physician, nor Dr. Chomsky, the cardiologist, deemed Garrett unable to safely perform his duties. Dr. Gill noted a "6 hour" daily restriction, but that was clearly an error and one that was promptly corrected. Nevertheless, Garrett remained off work for more than a year thereafter, allegedly because he had an ICD implant and could not pass fitness for duty requirements.

The parties agree that no rules or regulations, no job description, nor any CSXT written policy required that an engineer with an ICD sit out of work for a year after the implant, or have an MET level of 8 to 8.5 with an LVEF of more than 40% prior to returning to work. Rather, the decision to place Garrett out of work based on those requirements was unilaterally made by Dr.

7

Heligman.[5] Whether this was the real reason, and a legitimate one, is something the jury will need to decide.

On the one hand, Garrett had taken intermittent leave on four occasions in the past without any problem, yet this time his treating physician noted (albeit mistakenly) that Garrett needed to take 6 hours off per day, and this led to the discovery of the implant, which raised additional concerns. A reasonable jury could conclude that requiring Garrett to meet the requirements set forth in Crane's email was not intended to interfere with the taking of FMLA leave or retaliate for having taken such leave because (1) Garrett had taken FMLA leave unfettered in the past; (2) Dr. Heligman's served on the 2012 Railway Administration Medical Standards Committee that considered relevant medical literature and made certain recommendations regarding railway workers; and (3) CSXT has an obvious interest in insuring that its trains are operated safely,

On the other hand, the jury's suspicions may be aroused by CSXT's almost immediate alternative explanation for the denial of intermittent leave to an employee who had already been granted four such leaves in the past. It could also wonder whether the conditions required by Dr. Heligman had a sound medical basis given Dr. Chomsky's recommendation that Garrett be returned to work "ASAP." A jury might also question whether safety was a legitimate concern because the Medical Standards Committee's recommendations were never implemented.

---

[5] In both its moving papers and reply, CSXT asserts that it imposes the same restrictions on all engineers with ICDs but that "fact" has not been established on the record before the Court In his deposition, Dr. Heligman acknowledged that CSXT has not adopted such a written policy *per se*, but rather the "policy" was established by his department. (Heligman Depo. at 77, 80). He also acknowledged that trainmen returning to work after an ICD implant is "infrequent," but he did not identify any such trainmen or whether they were required to meet the same requirements imposed on Garrett prior to returning to work. (Id. at 97). Further, in response to Garrett's interrogatory requesting that CSXT "[i]dentify whether any other Engineers have been place out of service for heart related conditions" and provide their names and contact numbers, CSXT objected on the grounds that "this interrogatory is not proportional to the needs of this case, seeks the disclosure of irrelevant information, and unfairly seeks to invade the privacy of CSXT's current and/or past employees." (Doc. No. 32-9 at 71).

"'[I]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled.'" Mullendore v. City of Belding, 872 F.3d 322, 327 (6th Cir. 2017) (quoting Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012)). Similarly, "[i]f an employer interferes with the FMLA-created right to medical leave . . . a violation has occurred[.]" Arban v. W. Pub. Corp., 345 F.3d 390, 401 (6th Cir. 2003). It will be for the jury to determine whether any of those two things occurred in this case.

In reaching this conclusion, the Court recognizes CSXT's argument that Dr. Chomsky is not in the best position to opine about whether Garrett is qualified to be an engineer. However, while Dr. Chomsky may not have been aware of the details of Garrett's job, he was aware that it was a "safety sensitive" position, and he and Garrett had talked about Garrett's job in the past. Further, while Dr. Heligman's specialty is occupational medicine, Dr. Chomsky is a cardiologist who testified in his deposition that Garrett is "not really at risk for a coronary event" in the form of a heart attack, and that the risk of abnormal heart rhythms for individuals with congestive heart failure like Garrett is "statistically very low." (Doc. No. 32-5, Chomsky Depo. at 7, 26). It has long been the law that determining the weight of the evidence and the credibility of witnesses is for the jury to determine. United States v. Scheffer, 523 U.S. 303, 313 (1998) (citing Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891)); Sartor v. Arkansas Nat. Gas Corp., 321 U.S. 620, 628 (1944).

**B. ADA and TDA Claims**

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The TDA is similar: it

9

provides that "[t]here shall be no discrimination in the hiring, firing and other terms and conditions of employment of . . . any private employer . . . based solely upon any physical, mental or visual handicap. . . ." Tenn. Code Ann. § 8–50–103(a) (2002). Because they generally prohibit the same sorts of discriminatory acts, the ADA an the TDA are analyzed utilizing the same standards, except that the TDA does not require that employers make a reasonable accommodation. Cardenas–Meade v. Pfizer, Inc., 510 F. App'x 367, 369 n. 3 (6th Cir. 2013); Bennett v. Nissan N. Am., Inc., 315 S.W.3d 832, 841 (Tenn. Ct. App. 2009).

As a part of a *prima facie* case under the ADA, a plaintiff must show that he is qualified to perform the essential functions of his or her job. Mosby-Meachem v. Memphis Light, Gas & Water Div., 883 F.3d 595, 603 (6th Cir. 2018); DiCarlo v. Potter, 358 F.3d 408, 419 (6th Cir. 2004). The same is true for claims brought under the TDA. Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000); Bennett, 315 S.W.3d at 841. CSXT argues Garrett cannot establish this essential element, and, for this reason, his ADA and TDA claims fail. It also argues that Garrett's ADA claim must be dismissed for the additional reason that he cannot show he requested a reasonable accommodation that was denied, which is another essential element of a failure to accommodate claim under the ADA. Mosby, 883 F.3d at 603; DiCarlo, 358 F.3d at 419.

The same questions of fact that preclude summary judgment on Garrett's FMLA claim and the issue of whether he was physically qualified to be a railroad engineer, also preclude summary judgment on the issue of whether he was qualified to perform the essential functions of his job for purposes of his ADA and TDA claims. This is even more so in the ADA context because the Sixth Circuit has repeatedly noted that "[w]hether a job function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'" Rorrer v. City of Stow,

743 F.3d 1025, 1039 (6th Cir. 2014) (quoting Keith v. Cnty. of Oakland, 703 F.3d 918, 926 (6th Cir. 2013)). And, because a factual dispute exists as to whether Garrett was qualified, it follows that whether any accommodations were even necessary is an open question.

Also open to question is CSXT's assertion that it was entitled to require that Garrett meet the conditions imposed by Dr. Heligman based upon the provisions of 42 U.S.C. § 12112(d)(4)(A) that permit medical examinations and inquiries "shown to be job-related and consistent with business necessity." A similar argument was raised and rejected in Garr v. Union Pacific Railroad, Garr v. Union Pac. R.R., No. 10 C 5407, 2013 WL 68699, at *1 (N.D. Ill. Jan. 4, 2013), a case that presented analogous facts.

In Garr, plaintiff was an engineer for the Union Pacific Railroad who suffered a heart attack, was diagnosed with coronary artery disease, underwent triple bypass surgery, and, decades later, had an ICD implanted. Within a month of the implant, his cardiologist released him to return to work without restrictions. However, the Associate Medical Director for Union Pacific questioned that decision and requested additional information. Ultimately, plaintiff did not return to work and later filed suit under the ADA and comparable Illinois law.

Union Pacific argued that requiring plaintiff to meet DOT/FMCSA cardiac guidelines was "job related and consistent with business necessity" and, therefore, summary judgment was appropriate. The court disagreed because the evidence showed Union Pacific never formally adopted the DOT/FMCSA guidelines for use in determining fitness for duty as an engineer; Union Pacific allowed some employees with ICDs to return to safety sensitive positions; and, even assuing the guidelines were adopted, Union Pacific did not establish they were applied in a uniform manner. In short, plaintiff "raised a genuine dispute as to whether defendant in fact adopted and uniformly

11

applied the DOT/FMCSA guidelines as part of its process of determining when an employee is fit to return to a safety-sensitive position," id. at *7, making summary judgment inappropriate.

Likewise in this case there is a question of fact as to whether CSXT's actual policy is the one imposed by Dr. Heligman in this case (*i.e.*, the year wait, an MET level of 8 to 8.5, and an LVEF of more than 40%) and, if so, whether that is uniformly applied. Given Dr. Chomsky's and Dr. Heligman's competing opinions, there is also a question of fact whether those requirements are indeed job related and consistent with business necessity.

### III. Conclusion

On the basis of the foregoing, Garrett's Motion in Limine (Doc. No. 33) and CSXT's Motion for Summary Judgment (Doc. No. 27) will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE